May it please the Court. Michael Stromwasser for Appellants. I will be ceding five minutes of my time to the State, which will be represented by Susan Durbin, Deputy Attorney General. And, Your Honor, for the Court's permission, I'd like to reserve several minutes. Well, you have a clock in front of you. I'm sorry, Your Honor? You have a clock in front of you, and you can reserve whatever's left on the clock. Thank you. At the outset, I would like to emphasize, Your Honors, the question before this Court is not whether there's going to be mining in Soledad Canyon. There's a mine there today. There's been mining historically. There are currently active mines in the vicinity. The issue today is that CMEX wants to radically expand that mining to five tons per minute extracted for 20 years. And they may well be able to do so, but only if they have complied with the laws governing this serious business and they have not yet engaged in a public, intellectually honest environmental review process. Perhaps the most important example of this failure is Appellee's treatment of the scarce water resources, particularly as that affects their obligations under the Endangered Species Act. Water, of course, is important because there have been two endangered species that have been acknowledged to be on the property, the stickleback and the arroyo toad. And it's worth recalling that originally they only acknowledged one. Then we found one species, the stickleback. It was not until the city of Santa Clarita brought in an independent biologist that the arroyo toad was discovered, and the government acknowledged its presence. Adequate water is critical for both the toad and for the stickleback for survival and for breeding. BLM is authorizing a project in which CMEX will remove over 700 acre feet of water per year from the Santa Clara River. To do that, they have issued incidental takes that address the effect of the water, the absence of water, rather, on these two species. I thought the water came from the groundwater, not from the river. Well, the term groundwater is actually a little misleading in this case because of the unique hydrology. There is surface water. The surface water goes down to a small aquifer. But the specific configuration is that there is bedrock. Above the bedrock sits the river, some of which is in alluvium and some of which is free-flowing water. There is this odd term that they use. There is underflow in which there's actually a flow of the river underneath the water. There's a point in the river where the water or the riverbed thrusts up. And so the water that had been in subsurface flow and some of the water that may have been in the aquifer is pushed up to the surface and then travels on the surface. This is a problem I have with your entire case. It appears outcome-driven. And the point of the procedural rules is to make sure that a hard look has been taken. It seems to me that if you take a hard look at something and you decide that we just simply have to wipe out these toads because we need some kind of an international airport, I mean, the toads go. And you start out by telling us you don't like the outcome. And I don't think this case has anything to do with the outcome. It has to do with the process that's been used. Absolutely. I absolutely agree. So why do you start out telling us you're worried about a toad? Well, I'm worried about a toad and a fish because the process that these defendants ---- You didn't tell us about the process. You told us about the fate of the toad and the fish. Okay. Well, the specific aspect of the process, which I am addressing, is the evidence and the representations made in the evidence about those two species. And what I'd like to do, if it would be responsive to Your Honor's question, is ---- And they're not so much outcome-driven as to simply make sure that a hard look has been taken at the environmental consequences, that everything possible has been done to mitigate those. You know this stuff. Right. We constantly get, but they're killing the toad. They're killing the bird. Your Honor, let's set aside whether or not the outcome to the animals is satisfactory or unsatisfactory. Let me just address the ---- I take it it is clear that the process that has got to be gone through is that if there is jeopardy to a species, they have to do a biological opinion, and if there's going to be take, there has to be incidental take. And I would like to address the sufficiency of that way in which the defendants address their obligations to do just that. You know, the other side says they really don't care about gnat catchers and toads. These are all sort of Trojan horses for trying to stop the thing, period. What's your answer to that? I mean, there's even editorials and newspapers saying, you know, if the gnat catcher's in your way, the gnat catcher goes. If the toad's in your way, the toad goes. But when it's convenient to love the toad and the fish, we now love the toad and the fish. And the whole thing, of course, sheds some light, maybe or maybe not, on the sincerity of the city in pursuing these kinds of outcome-driven arguments. And my answer is that the sincerity of the city is immaterial under the environmental laws. If we – if people who were bringing public enforcement citizen lawsuits under NEPA, the Endangered Species Act, the Clean Water Act, had to take a polygraph in which they said, I really do care about the species, about the water. It's not that I wanted – I just want to keep the view from my house clear. We wouldn't have those lawsuits. The cases have never said – You're conceding you really don't care about the toad. Absolutely not. I'm saying that you don't have to reach what is an interesting and difficult question of municipal psychoanalysis. It is utterly irrelevant. It is utterly irrelevant. I will add that it is a bizarre notion. I mean, I agree that the unpopularity of this project in the vicinity of the affected people ought not to drive the result. But it ought not to lead to it being disapproved. But please do not let the unpopularity of this project disable the merits of the points the city is raising. I've been trying to get you to the merits. Very good. The – what this Court said in the Oregon Natural Resources case all the way back to Arizona cattle growers, it said that if an endangered species is involved, the government has to issue a biological opinion.  I now propose to tell you why the incidental take and the biological opinion is, on its own terms, erroneous. It's not enough that it be erroneous. It has to be arbitrary and capricious. Arbitrary and capricious, exactly. Ah, well, there's a difference there. For instance, you claim that the Fish and Water Service has incorrectly estimated how much of the river's water will be used when they estimated it would be 9 to 15 percent. 9 to 15 percent would be plenty for the sickleback and the toad. You claim it's more like 25 percent that's going to be taken. Fine. That wouldn't – that wouldn't leave enough water for these two animals. Fine. But now you have to tell me why the methods used by FWS, Fish and Wildlife Service, are arbitrary and capricious in getting to 9 percent and 15 percent, and why anything but 25 percent is arbitrary and capricious. Never mind 25 percent. Let me show you why the biological opinion and the incidental take statement for the pump the river dry. That would undoubtedly, unquestionably, I don't think – I think undisputably result in take that is not authorized by the incidental take statement. The evidence is very straightforward. First of all, the amount of water – let me do a little geography here. Three segments of the river upstream of the project, downstream of Old Lane Station and between the two. The Fish and Wildlife Service say upstream of the project, they're fine. We don't disagree. Downstream of the project, they have a very sensitive habitat, and the biological opinion of the Fish and Wildlife Service says this is an important population. In between, it's an ephemeral stream.  Now, how do they get to that? Well, they get to that, first of all, by saying that any time that the pump may well cause others of them to die, I'm not even going to – fine. Let's assume that that is not a significant take. But there is, in the incidental take statement, there is no provision for anybody dying south of Old Lane Station. Their analysis is there will be no take south of Old Lane Station. Now, how do they get to that? Well, they get to that, first of all, by saying that any time there is a reduction in water such that it would be a jeopardy to those folks, there will be a reduction in pumping. That is false. The biological opinion and the ITS specify four conditions for reducing pumping, two of which have to happen in order for there to be any obligation. And by the way, you can't tell what the obligation is. But they talk about reduced or terminated pumping. Two of them clearly don't apply here. Water temperature, oxygen, doesn't matter. Flow is just a matter of the velocity of the water. It's expressed in meters per second. It has nothing to do with the volume of water, the availability of water. The only one that is arguably relevant to the availability of the water that the ITS and the DO say will be there is the reduction in depth. What does the opinion say and what do the conditions say about the reduction in depth? They say that CMAQs may be required to stop or reduce pumping if there is a 25 percent reduction in depth from one month to another. It follows from that, and I don't understand there being any dispute, a 24 percent reduction in one month does not reduce at all the pumping. A second 24 percent in one month doesn't reduce the pumping. There is nothing in the ITS that will prevent CMAQs from, in 24 percent increments, drying up the entire river, pumping the river. There's nothing there. Now, the only analysis, and by the way, it is interesting. But by our own terms, if it reduces 25 percent depth, that leaves 75 percent depth. If you pump 24 percent depth every month, you leave 76 percent depth. Seventy-six of what's left. That's right. So what are you talking about having the river run dry? That's a pretty wet dry, isn't it? So the second, well, first of all, we're talking about a river, which if you look at the BO, the depths are measured in inches frequently. And there's a very sensitive range in which the animal can survive. But let's say that, you know, in one month, you go from 100 percent to 76 percent. In the second month, you take 25 percent of that, which gets you to a little over 50 percent. Oh, yeah, but. Fifty percent of the beginning. But you're using the base measurement is always 100 percent of the beginning, isn't it? Well, it's not 100 percent of what is left over and 100 percent of what is left over. Well, that would make it even worse. That means in four months of 24 percent removals, you can get left with 4 percent. Right. But the way I read it is that 25 percent reduction of the depth means the depth at the beginning. Of the first month or at the beginning of the previous month? First month. I mean, if that is the case, then in four months, you can pump the river dry. All right. Go ahead. You're assuming that once the river goes down, it stays there forever. I mean, can't it come back up in the interim? Well, sure it can. Well, then that's then your argument goes down with the river going up. And I would like to see the analysis in which they say how often will that happen. And the analysis is not there. The only analysis. We had floods of the Santa Clara River in 1998 and 2004. You had. Just wiped out all sorts of levees. Yeah, yeah. You had three floods in the 20-year study period that by themselves account for over half of the water in the entire river. So 17 of those years, it was vastly less. Maybe it turns out that one flood every five years is good enough to save the species. But the DO doesn't say that. There's no biological evidence of that. But the approach is, and it can be found in a single page, 317 of the excerpts of record. This is not out of the biological opinion significantly. Actually, there's very little discussion of acre feet or gallons or any volume in the biological opinion. But in the FEIS, they say, here is a comparison of the pumping to the river. And they say that the pumping will be 742 acre feet. And here's what the pre-project flows were over a 19- or 20-year period. They have 19 years and then a fraction of a 20th. And they go through it and they sum that up. And they say the average, that is to say the mean of the yearly flows was 3,552 acre feet. And 764 acre feet is only about a quarter. What's the problem? There won't be a problem. The problem is that that 3,500 acre feet is an artifice. That is a mean of these numbers. The median, that is to say the average year, this river is only at about 1,269 acre feet. So that in an average year, they are authorized to take over half of the water. And if you look at this table, you will show that in three or four years of this 20-year study period, they would be authorized to pump the river completely dry. Now, maybe that's okay. Maybe a good biological analysis will show that emptying the Santa Clara River doesn't hurt the endangered species. Maybe so. I'm doubting it, but maybe so. They should be put to that task. That's what they are required to do under the law. That is what the Endangered Species Act requires. The interest of time. Kennedy. This is a point you raised before the agency?  May it please the Court. The position is that as a result of not taking into account the possibility of the river being pumped dry, the BO is arbitrary and capricious. Exactly. Pardon me for interrupting you, Madam. May it please the Court. Susan Gerben with the Attorney General's Office. We thank you for allowing us to oral – present oral argument. And the Attorney General is sorry that scheduling – I don't know why you changed it. I'm sorry? Go ahead. The clock was off. The standard for application of the bad faith exception to the American rule for attorney's fees is just that. It is to apply in exceptional circumstances. The State has submitted an amicus curiae brief here because we do not believe those circumstances apply and because we believe that the imposition of attorney's fees against the City of Santa Clarita in this case, where it has raised very substantial questions of compliance with environmental laws, would be a severe blow to the enforcement of those environmental laws by municipalities as well as by others. Now, the standard for bad faith conduct boils down to two things, conduct, motive. Neither one of those has been violated by the City here. I didn't hear you. Conduct what? Conduct and motive. Conduct and mode? Motive. I'm not hearing your last word. Sorry. Motive. Motive. The kind of conduct that the cases say qualify a defendant to receive or any party to receive an imposition of attorney's fees is really egregious conduct. It's lying to the court about facts outside the case, as in the St. Paul insurance case. It's deliberately disobeying a court order. It's deliberately not doing what a court tells you to do or doing something the court tells you not to do. There is no allegation that the City has done any of those things here. There is no conduct that the City has committed that rises to the level of wanton, vexatious, repressive conduct. Frivolousness is one of those conducts, right? Yes, Your Honor, that is correct. However, we have briefed at least two issues in our brief that show that the conduct of the City here was not frivolous. It brought very serious and legitimate questions of environmental compliance. How is frivolousness determined? Is it by lawsuit by lawsuit, issue by issue? I mean, let's say they have a really good claim. I'm just speaking here hypothetically. Let's say a party has a very good claim and then brings nine other claims that are frivolous. Are they subject to sanction for any of their conduct? Fighting the first part of the hypo, Your Honor, we believe that the claims here were not frivolous. However, you know, if you don't want to answer the question, you don't have to fight the hypo. Just say I don't want to answer the question. I pose the question to you. If you don't choose to answer it, that's okay. I do, Your Honor. But what's the point of saying that? Simply that there was no frivolousness in this case. However, as Your Honors know, you've seen many cases. It's not for you to decide. We will decide whether it was frivolous or not. You can tell us whether or not. I mean, you're here on attorney's fees, right? Yes, Your Honor. Okay. So the question of whether any part of the lawsuit was frivolous or not is for us to decide. Yes, Your Honor. You're here to help us with the fees. Yes, Your Honor. Okay. So are you going to answer my hypothetical? If all of the causes of action in a lawsuit are frivolous and without merit and without foundation. That's the question I asked. Would you like me to repeat the question or do you remember the question? I do remember the question, Your Honor. Answer the question when I asked. I believe that if any of the causes of action are well-founded, that the lawsuit as a whole may not be subject to sanctions. And even if it is, they should be parsed out. Can any part of the – can it be sanctioned for litigating any part of the lawsuit that is frivolous? I don't believe the cases have ever held that, Your Honor. They have looked at the totality of conduct and the totality of the causes of action brought by the plaintiff. So your position is that one good claim entitles a party to then litigate all sorts of claims that are – that are not available? No. I would say that if any of the other claims are completely frivolous or without foundation, like in the St. Paul insurance case where the plaintiff actually produced – possessed information showing that it could not possibly prevail, then that would indeed be frivolousness that justified sanctions. So the plaintiff's claim that the city conceded was without merit? The city conceded that part of it was without merit. It did not concede that it was totally without merit. And in fact, the disposition of the materials farther down the line was a legitimate issue that could have been addressed and should have been addressed by the BLM when it made the initial decision to put the materials out for bid. I have with 30 seconds left, I'd like to mention the 401 cause of action here, which is not a frivolous claim. State is very concerned that the BLM has issued this rod that allows a discharge to the Santa Clara River without obtaining the 401 certification. But they need a 404 permit, don't they? 404 is not the only circumstance under which they do not require a 404. They have not gotten a 404 permit yet. But they will need a 404 permit before they can discharge anything into the river. That is not correct, Your Honor. They need a 404 before they can dig the wells that will produce a discharge to the river. We have pointed to the evidence in the record that ---- How is that different? Well, we have pointed to evidence in the record that shows there will be a discharge from a different source that is not subject to a 404. It is subject to a 401 because it is a source of discharge to the river. I'm sorry. I missed that. Explain it to me. A 404 permit applies to the Corps of Engineers when they disturb the riverbed. It's generally a dredging kind of permit. It's a federal permit. You take something and put it into the waters of the United States. Yes, Your Honor. But 401 is a broader provision than that. It covers any discharge as the S.D. Warren case. When is a permit or a license? It's, Your Honor, the rod here allows the construction of a project whose operation will indeed result in a discharge directly from a culvert to the river. We've put that in the excerpts of record to our brief and cited to that in our brief. A 401 ---- In your view, that does not require a 404 permit? Not the stormwater discharge, stormwater pollution prevention plan does not, Your Honor. But it does require a 401, which they have not yet gotten. And therefore, it should be returned to the BLM to get that permit before they issue the rod. Have they been formally relieved of any obligation to get a 401, assuming they have to get one? Not to the best of my knowledge, Your Honor, and the State would like to see them get it. I don't know how they could possibly be relieved of that since it's a ---- Then what's the problem? They have gone ahead and issued the rod without getting the 401, and the Clean Water Act is very clear that you have to get the certification before the rod or the permit or the license is issued, before the authorization for the project is issued, so that they can attach the conditions that the State may request, and the State Water Resources Control Board, the regional water ---- It says the rod is a permit for purposes of 401? I did not find one, Your Honor. I think the duck rule applies here, that if it looks like a permit and it quacks like a permit, if it authorizes a project whose operation will cause discharge, it functions as a permit and does require the 401 certification. But you agree that if it grunts like a pig, then it may be a pig, not a duck? Yes, Your Honor. Thank you. Thank you. We'll hear from the other side. May it please the Court. I am David Shultz from the Department of Justice representing the Department of Interior, and I'll be sharing some of my time with CEMEX. I thought I would first speak to the Endangered Species Act issue, the adequacy of the biological opinion, and then speak to the Section 401 Clean Water Act issue, if that's acceptable. With regard to the adequacy of the biological opinion, I think the first point is the standard of review here. This Court's cases have made clear that the judgments that are made by the Fish and Wildlife Service when it is coming out with a biological opinion and deciding what is necessary to avoid jeopardy to a species are entitled to a great deal of deference. The Fish and Wildlife Service is the agency with expertise on what these particular species require. And in this case, the Fish and Wildlife Service came out with a very careful biological opinion, which showed a number of things. One, the stretch of the river that's adjacent to the project dries out every summer. It always has. And the stickleback, which are in that section of river, they die. The stickleback as a species is used to that. What's important is there are a few areas of water that run all year, not right next to the project, but there's one just downstream in a river's end trailer park area. So what the Fish and Wildlife Service said was this project is not going to cause jeopardy, but what we do want to see done here is for you to protect that area downstream and make sure that it is not dewatered by reason of pumping from the project. And we'll do that by placing these four action levels, and they're going to be carefully monitored. And if at any time you reach two of the action levels, then you have to stop pumping. Now, the action levels, there's one that's depth. There's another one that's the rate of flow. Another one is the oxygen level, and the other one is temperature. And I disagree with appellants that you can just put oxygen and temperature aside, because if the water level near that trailer park starts to go down, the oxygen level is going to go down, the temperature is going to go up, and so those action levels themselves could trigger a cessation of pumping. But then you also have the flow and the depth. And they measure it monthly. If the flow or depth is more than 25 percent drop from the previous month, that triggers that action level. So these four action levels are going to prevent any dewatering of that area of important habitat. And I think the judgment that those are adequate to protect that habitat was careful and is due a great deal of deference. Let me ask you a little bit about the visualization of what this whole water flow looks like. First of all, you talked about the area downstream. This is past Old Lang by the trailer park. Right. Is that where they're monitoring for flow and depth? Yes. That's where they're required to monitor for those four factors. There's going to be other kinds of monitoring going on elsewhere. Can you tell me a little bit about that? Yes. There is also monitoring at the other end of the project, the upstream end of the project. And that is because at the upstream end, there is something called the bedrock channel. That's where Southern Pacific, when they put the railroad through, instead of building two bridges, they just rerouted the stream, as you used to be able to do in the 30s. And they blasted it through bedrock. And because it's through bedrock, it runs later in the year than the rest of that area. And that is where they discovered some tadpoles of arroyo toads, which is an endangered species. So they have to monitor that upstream area to make sure that the flow that's coming into the bedrock channel is not stopped by reason of project pumping. And to do that, they have to monitor the groundwater level. And if it drops more than half a foot, as compared to what would be happening naturally, then they've got to stop pumping there to protect that channel. And I think, again, that judgment. And how is the water pumped? The water is pumped from wells, right, from groundwater? It is, yes. There's an aquifer in this area. And the aquifer feeds the river, or vice versa, right? It does, yeah. When you lower the level of the aquifer, that might have an effect or will have an effect on the river. It can. There's a very complex relationship between the aquifer and the river in this area. It depends a lot on where the bedrock is. At some points, it gets very close to the surface, like at Polang. Other points, it's deeper. What happens to the water that's pumped? It is used for keeping dust down, for washing things, for the process. And then it's all recycled, so there is no discharge of that water back to the stream. It's all used on site. So whatever water is pumped is taken away from the stream? It is taken away. But as far as the charge that they're going to pump the river dry somehow, what the city is looking at is figures for surface water. And that ignores the fact that this water is being pumped from the aquifer, and the aquifer does get recharged during the winter. Now, there is a relationship, obviously, between the aquifer and the surface, and so that's why they do all the monitoring to make sure that the pumping from the aquifer is not adversely affecting these two areas where the habitat is. But if, in a particular year, they've had an extremely dry year, and there is a real problem with water shortage, the species are going to trump the project, because if these action levels are triggered, they've got to stop pumping. And so it's not correct. I mean, even if the city analysis was correct, and I don't think it is, about the amount of water, that would simply mean that CEMEX would have to stop pumping, because these conditions that the Fish and Wildlife Service imposed are mandatory conditions, and they've got to be followed. So I think if you look at those conditions, and if you look at the incidental take statement, you'll find that the agency did take a very hard look at this and imposed appropriate conditions. Now, on the Clean Water Act 401 issue, if I might go on to that. First of all, we think that issue was waived. What they're arguing is that the BLM, when it came out with this Record of Decision, or ROD, in 2000, should have gone to the state for a certification, but they never raised that before the agency. When they appealed through the agency appeal procedure to the Interior Board of Land Appeals, they did not raise this issue. And so we think, particularly for a project which has been subject to as many environmental hurdles as this one, that it is incumbent on any plaintiffs to raise their points before the agency where the agency has an opportunity to deal with them and not just bring them up in a later lawsuit. And so we've cited the Marathon case for waiver, and we believe this would be an appropriate case for waiver. We also note that there is a real laches issue here. This was argued by Semex in their brief. We incorporated it by reference. But as the district court held in its summary judgment order, this is at page 1661 of the excerpts of record, this claim should also be barred due to laches, because after the IBLA had rendered its decision in 2002, the city filed its first lawsuit with a variety of claims. They could have thrown in their section 401 claim then, assuming it wasn't waived by not raising it before the agency, but they didn't. They waited until their second suit. So we think there's also a laches problem there. And I think the equities strongly favor barring this claim at the threshold. But on the merits, I don't think there's anything to the claim, really. The statute refers to a permit or license for an activity which may discharge. And as was pointed out during Ms. Durbin's argument, there's simply no cases which have pushed this requirement back to this sort of early approval of a plan, which is what the ROD was. And I think that is because what Congress clearly had in mind here was approval of an activity where there's a close nexus with an actual discharge. The Supreme Court said in the S.D. Warren case that the essence of this requirement is discharge. And where you have simply a record of decision, which is approving a general mining plan at a point where you don't really know where or whether there may be discharges, it simply doesn't make sense to say that this is a permit or a license for an activity which may discharge. All of the cases that have been cited involve things like FERC licenses for a hydro project, where what is being permitted is an activity which directly discharges water. Or 404 permits, where you get a 404 permit to put dredged or filled material into waters of the United States. You've got to get a 401 certification from the State. Well, again, there's a very close nexus to the discharge. So I think that's the reason why there are simply no cases which have pushed this requirement back as far as the city would to apply it to the record of decision. But what happens if the process goes forward and it turns out there is a discharge? At that point, you have to apply for a 401 permit? If there is a discharge of dredged or filled material, then they have to apply for a Section 404 permit, and they will have to get a 401 certification, absolutely, from the State. Now, if there is a discharge that would be under Section 402 of the Clean Water Act, that's discharge of basically any other type of pollutant, that program has been taken over by the State. It's run by the State of California. So you get your permit in that case from the State. So they've not been freed from any obligation to pursue these, should the eventuality occur that you've described? That's correct. Yes, it's very important to point out that all of the State's water quality requirements and effluent limitations will apply to this project. There's no question about that. Section 401 is kind of a belt and suspenders approach that Congress adopted to say that where there's a Federal permit associated with a discharge, that the State's requirements should also be put in the certification for that Federal permit. But if there is no Federal permit, and we don't think the rod is there, the State's requirements are still going to apply. This project is going to have to comply with the stormwater requirements and so forth. And so I think that goes to the equities as well. If you look at the equities on the waiver situation, if the City is able to bring this claim at this late date when it did not bring it before the agency, you know, the project and the BLM have relied on this BLM for all these years. And I think there's a lot of prejudice there. Whereas, if it's held to be waived, the City doesn't suffer any prejudice because all of these requirements will apply anyway. Unless there are other questions, that's all I have. Thank you. Okay. Thank you. We'll hear from CEMEX. Good afternoon, Your Honors. Patricia Brody for CEMEX. I'm going to be addressing very quickly the attorney's fees award. First of all, with regard to the big picture in the case, obviously the concern of CEMEX is with upholding the rulings on the substantive NEPA ESA cases, and we agree with the fact that it's arbitrary and capricious standard and procedural matter with which the Court should be concerned. We want to call the Court's attention to the fact that there are many claims and defenses which were asserted below which were not even briefed before the Court in the record, which means that they had been waived before the Court. For instance, the 9th, 10th, 11th, 13th, and 15th causes of action of the NEPA case,  with regard to procedural bars of the 5th, 6th, and 7th causes of action, there's no briefing on the appeal. The point is that with regard to eight of the 15 cases in the NEPA, they have not even sought appellate review. And this is an example of the spaghetti approach which the Federal defendants pointed out in their brief, which is the habit of Santa Clarita to throw as many claims as they can against the wall with the hope that something will stick. And they threw a lot of claims against the wall in the NEPA case. None of them stuck. Everyone was ruled against on the merits, not just on equitable grounds. And they haven't even bothered to argue about half of those clauses of action before this court of appeals. Well, maybe they're paying attention to the books that are written that say don't appeal everything or you'll ruin your appeal. Maybe so, Your Honor. Maybe so. But what it is is when they say that how can our arguments be without merit if it takes the district court 60 pages to review them and CEMEX thousands of hours to dispute them? This is why. Because if you throw countless claims against the wall, the court diligently below examines each and every one, decides on the merits, whether it is good or bad, and decided each was bad. And the role of CEMEX as the party before the district court is to try and bring order out of chaos with regard to the claims and the way it's being asserted by the city of Santa Clarita. With regard to the award of attorney's fees, the standard for the bad faith exception to the award of attorney's fees is abuse of discretion. Any factual findings which are a predicate to that award are reviewed for clear error. The bad faith ---- The other side says there are none. Unbelievable. There are no factual findings. Well, Your Honor, what I would point you to is there's three different orders and there's the summary judgment order itself, which is 60-some pages of analysis about why, in substantial part, some of these claims are barred because they're repetitive of claims that have already been asserted and rejected. So there's a tremendous analysis in the summary judgment order itself. There's a tremendous analysis in the findings. And then you have a summary attorney's fee order itself, which says and incorporates by reference all those findings and all that analysis. And it concludes ---- I marked something here that's tantalizing. Okay. It's on ASER 0207, page 12 of what the district court had to say. The endless litigation, along with the city's own internal documents, evidence that the city has sought to further its own agenda, et cetera, et cetera. What's the court talking about, the city's own internal documents? What the court's talking about, Your Honor, is the fact that there were presented to the court in connection with various motions for summary judgment documents that were ---- Excuse me, Your Honor, while I just look at it really quickly here. Documents that were produced from the city of Santa Clarita. And what they are, there were some notes of a TMC committee meeting where ---- And these are all documents that were before Judge Tavrizian. They were before him in connection with the summary judgment motions here, and they were before him repeatedly. Gotcha. Gotcha. What are they? They are that the plan for Santa Clarita is that the goal first is to get recirculation on the traffic portion of the EIR. Once this is achieved, we will ask for recirculation of the entire EIR, since the formulation is almost 10 years old. This has been ---- the goal is constant serial repetition of things, and not asserting them all in a timely fashion, but asserting them in a serial fashion in the hopes that the parties will get worn down, the courts will forget what the different claims are that are being made, or that ultimately after 20 or 30 or 40 years of challenges, appeals, and reviews ---- So one of these documents is SER 200? One of these documents is SER 200, Your Honor. Another one is SER 1070? 1070. And SER 1071. These are internal Santa Clarita documents, strategic opposition TMCs, legal tasks. And number six says attack all agency permits. This is one of the ---- they have a whole list of things they're going to do to try and stop the project. One is attack all agency permits. The second is to develop a packet of measures to interfere with TMC's business plan. Now, these were before the ---- Are you quoting when you use the word interfere? It's a direct quote. Quote, Develop package of measures to interfere with TMC's business plan. Close quote. It's SER 1070. These were before the district court. They were before the district court in connection with the NEPA in the ESA case, and they were also before the district court in connection with other litigation that it had. To answer your question ---- Fair? I mean, they don't want mine there. They're going to do what they can to stop it. I mean, I ---- Your Honor, they can certainly do what they can to stop it, and they can certainly spend $7 million if they want to do what they can to stop it. But at a certain point in time, you can't make the same arguments over and over again and pretend that they haven't already been ruled on. That's motive? It's motive, Your Honor. And bad faith involves the merits of the case, the tactics that are used, and the motives. And to answer your question, Judge Kuczynski, with regard to whether all the claims have to be bad, and we think they are, but the case law is that they don't all have to be bad. With regard to that, I would quote from Fink v. Gomez, which we have cited to the Court, which is a 2001 Ninth Circuit opinion. And what it says in there, A finding of bad faith, such as will permit the Court to impose sanctions under its inherent powers, does not require that legal and factual basis for action must prove totally frivolous. If the litigant is motivated by bad faith, an assertion of a colorable claim will not bar the assessment of attorney's fees. So to answer your question, even if you find that one or two claims has merit, it will not bar the award of attorney's fees. So you don't like the no competent attorney test? Well, that's a Rule 11 test, Your Honor. And this is not a Rule 11 sanction. It's pretty clear that the inherent power of the Court to award sanctions is separate from Rule 11. So the no reasonable attorney would have brought it is not the right standard. Frankly, I think we could have met that. I think you have to be motivated by vindictiveness. Do you find vindictiveness here? Oh, yes. Oh, we do, Your Honor. We definitely do. Authority? Yes. Yes, Your Honor. That's been defined to be an alternative word for bad faith. But in terms of the different courts that have applied bad faith, they have found it where claims have been brought without legal foundation in the Primus case. Misstatements of law are fact in the Fink case. And we have cited the Court to instances in the record where Judge Tavrizian below constantly told the Santa Clarita attorneys that they were misrepresenting the facts to him. They were giving him pieces of information and documents and not the whole thing. Is the standard of review abuse of discretion? Yes. It's abuse of discretion for the decision to award attorney's fees. It's clear error for any findings that are the basis of that. Okay. Thank you. Your other trial, please. But we'll give you a minute for rebuttal. Thank you, Your Honor. Quickly on the motive question. These we were engaged in petitioning the United States to change government policy. Since when under the First Amendment do you ever ask whether a part, whether the motive for petitioning the United States to change government policy? This is following. With respect to the Clean Water Act claim, the exhaustion doctrine, the American Canoe case says the exhaustion doctrine is satisfied by giving a 60-day notice. They did that here. With respect to the question of discharge, I think it is a little shameful for the United States to discharge because of 404. As Ms. Durbin explained, 404 talks about a different discharge. We are talking about 401 for discharge. I heard the other side say that 401 is downstream yet. And at any time it appears that conduct is going to occur that brings in 401 into play, they've got to comply with all the rules. Well, that's fine. And if that's the way the rules should be, we should tell Congress that, because the last sentence of Section 401A1 says no license or permit shall be granted until the certification required by the section has been obtained. Congress has decided certification happens first. Congress has also decided you don't have a case either that says the rod is a permit. No. All I have on either side. But what I do have is cases saying that rods are final agency actions for purposes of CEQA and other actions. Okay. And we have a clear statement by the government. This is their final agency action to authorize the runoff, to authorize the project. Excuse me. The Attorney General has submitted a, their Storm Water Pollution Management Program. It is in ASER 94. It says that there will be discharges to the Santa Clara River of storm water. Now, if, Judge Trotty, if there were a question about, you don't know whether or not we wait to see, that is also inconsistent with the language of 401, which says that they have to get a certification if there may be a discharge to the waters. Before your time runs out, the documents that I asked the other side about to identify that are not identified by the district court, do you concede those are the documents or dispute the description of the other side of them? You will find it's hard to believe, but the airport lost the box with those, and so I couldn't pull them right now. As best I recall. You mean on your way up here? Yeah, exactly. As best I recall, and I didn't know there was a big market for it. Oh, except for record. The airport, no. The airplane lost the documents. Right. But as best I recall, there are documents that were litigation memoranda to people within the city from counsel, litigation counsel, and there may have been some documents describing things that were said by some people. The party here is the City of Santa Clarita. Whatever the motives of elected officials, hired contractors and others, were motives to be relevant cannot be attributed to the city from whatever the motives were of people who were urging them to take whatever action they were taking. Who said they can't if they were adopted by them? They can't if they were adopted by them? No, they cannot. You don't know why they were adopted. You can have some nut in the back of the room saying take this action because of the UFOs. That doesn't mean that they endorsed the UFOs. Judge Tregrizion found why they were adopted. But he did that by an inference that cannot be supported in the record. Who said that? What portion of the First Amendment is involved with a plan which interferes with Transit Mix Corporation's business plan? Well, how about the Norr Pennington Doctrine? Every plaintiff who goes to government and says how about passing a statute preventing my competitor from competing with me is exactly in that position. And we've – and the Supreme Court has said under the Norr Pennington Doctrine that is protected speech. Thank you very much, Your Honors. We are adjourned.
judges: Kozinski, Trott, Bea